UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NOZMI ELDER,

    Plaintiff                                         Civil Action No. 05-60254

v.                                                 HON. JOHN CORBETT O'MEARA
                                                   U.S. District Judge
                                                   HON. R. STEVEN WHALEN
COMMISSIONER OF SOCIAL           U.S. Magistrate Judge
SECURITY,

    Defendant.

_____/

## REPORT AND RECOMMENDATION

Plaintiff Nozmi Elder brings this action pursuant to 42 U.S.C. §405(g) challenging a final decision of Defendant Commissioner denying his application for disability and disability insurance benefits under the Social Security Act. Both parties have filed summary judgment motions which have been referred for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). I recommend that Defendant's Motion for Summary Judgment be DENIED, and Plaintiff's Motion for Summary Judgment GRANTED, remanding this case for further fact-finding and consideration.

## PROCEDURAL HISTORY

On August 16, 2002, Plaintiff filed an application for Disability Insurance Benefits (DIB) alleging an onset of disability date of January 11, 2001 (Tr. 49-51). After denial of

his initial claim, Plaintiff filed a timely request for an administrative hearing, conducted on August 10, 2004 in Detroit, Michigan before Administrative Law Judge ("ALJ") James R. Norris. Plaintiff's son, Dr. Mahir Elder, testified (Tr. 214-223). Plaintiff, represented by attorney Richard Skutt testified. (Tr. 214-234). Don Harrison, Vocational Expert ("VE") testified (Tr. 223-235). Medical Experts ("ME") Drs. Mary Jo Voelpel and Michael Finn also testified (Tr. 235-236, 238-251). On February 24, 2005, ALJ Norris found that although Plaintiff was unable to perform his past work, he retained the residual functional capacity to perform simple and repetitive unskilled work at all exertional levels (Tr. 22-23). On March 16, 2004 the Appeals Council denied review (Tr. 5-7). Plaintiff filed for judicial review of the final decision on October 3, 2005.

## BACKGROUND FACTS

Plaintiff, born November 26, 1947 was 57 when the ALJ issued his decision (Tr. 23, 49). A college graduate, Plaintiff previously worked as an airport operations manager and police officer (Tr. 60, 65). Plaintiff alleges disability due to stress, anxiety, depression, a sleep disorder, intestinal problems, and headaches (Tr. 59).

### A.   Testimony of Plaintiff's Son (Mahir D. Elder, M.D.)

On August 10, 2004, Dr. Elder, a board-certified internist, testified to his father's behavioral and health changes in the five years prior to the hearing (Tr. 214-215). He indicated that at first, his father exhibited only minor mood changes as a result of work-related problems, but as time went on, become prone to frequent and unprovoked outbursts (Tr. 215). Dr. Elder stated further that contrary to Plaintiff's customary behavior, he became

socially withdrawn, excluding himself from family functions as well as interaction with his friends (Tr. 215-216).   Dr. Elder reported that Plaintiff's condition had continued to deteriorate to the point where he neglected his appearance, refusing to shave or groom himself for weeks at a time (Tr. 216).  He added that Plaintiff exhibited poor concentrational abilities, apparently exacerbated by his erratic sleeping patterns (Tr. 217-218).  Dr. Elder indicated that Plaintiff was currently less explosive, but more withdrawn than previously (Tr. 218).

When questioned about his father's headaches, Dr. Elder testified that he correlated the headaches to the mention of airports or airplanes - either in conversation or on television, noting that he believed such discussions brought to mind Plaintiff's problems at work as an airport operations manager (Tr. 220).  He noted further that currently, his father, uncharacteristic of his former behavior, showed little interest in household or landscaping projects (Tr. 221).

**B.  Plaintiff's Testimony**

Plaintiff testified that events culminating in the loss of his job and the award of Workers' Compensation began with a personality clash between himself and a couple of co-workers (Tr. 224).  He indicated that he had been devastated by the loss of his job after 30 years with the airport, adding that before he was a manager, he had been employed by the airport as a policeman (Tr. 225).  Plaintiff stated that since leaving his job on January 11, 2001 he spent his time staying home and watching television (Tr. 227).  He added that his inability to concentrate made reading, driving, or performing household chores difficult (Tr.

228, 230). He concurred with his son's testimony that he experienced sleep problems, stating that he generally slept no more than four to five hours a night (Tr. 229-230-231). He testified that his concentrational deficiencies were aggravated by frequent migraine headaches (Tr. 231). He reported further that he experienced a low tolerance for noise and stress to the point where at times he was obliged to leave the house when his school-age grandchildren were around (Tr 232).

### C. Medical Evidence

### ii. Treating Sources

In January 2001, Plaintiff began treatment with psychiatrist Richard Feldstein, M.D. (Tr. 141). Plaintiff reported stress resulting from workplace problems, telling Feldstein that he experienced poor memory, confusion, and problems sleeping (Tr. 142). Plaintiff complained to Feldstein later the same week that he had been deliberately humiliated by his superiors (Tr. 139). In May, 2001 Plaintiff reported continued stress, flashbacks, and confusion (Tr. 132). In July, 2001, Plaintiff characterized his life as "out of control," adding that he continued to experience sleep problems (Tr. 129-130). In August, 2001, Dr. Feldstein deeming Plaintiff's prognosis "guarded," recommending "continued disability for an indefinite time," and stating further that "[Plaintiff's] attitude toward the workplace has become so negatively tainted and his feelings toward the employer so adversely affected by what has occurred" that he was prevented from returning to work (Tr. 146). In April, 2002, Plaintiff reported migraine headaches (Tr. 126). In September, 2001 Dr. Feldstein noted that Plaintiff continued to experience a "marked impairment of capacity to maintain

concentration, focus, and attention (Tr. 122).

In March, 2001 Plaintiff sought treatment from neurologist Machael J. Brazil, D.O. (Tr. 155). Dr. Brazil found that Plaintiff's attention span was "good," noting further that his "[i]mmediate, recent, and remote memory are intact" (Tr. 156). He concluded that Plaintiff experienced a sleep disorder, suggesting further that he might experience pseudo-dementia from depression, early dementia, or a vitamin deficiency (Tr. 157).

In September, 2002, Yassir A. Attalia, M.D., completed a questionnaire stating that Plaintiff suffered from depression, pseudo dementia due to depression, hyperlipidemia, chronic fatigue, and insomnia (Tr. 161). Attalia noted further that Plaintiff currently took Paxil for his condition (Tr. 161).

### ii. Consultive Sources

In November, 2002, Cynthia Shelby-Lane examined Plaintiff on behalf of the SSA, noting that he currently took Desyrel, Paxil, and Ativan (Tr. 164). Plaintiff reported migraine headaches and memory problems (Tr. 164). Shelby-Lane recorded that Plaintiff was "alert, awake and oriented to person, place and time" (Tr. 166). On the same day, psychiatrist F. Qadir, M.D. noted that Plaintiffs hygiene and grooming were only "fair," but observed that he exhibited average self-esteem and normal psychomotor activity (Tr. 169). Dr. Qadir concluded that Plaintiff experienced a major depressive disorder, assigning him a GAF of 50[1]

---

[1] A GAF score of 41-50 indicates "[s]erious symptoms ... [or] serious impairment in social, occupational, or school functioning," such as inability to keep a job. *Diagnostic and Statistical Manual of Mental Disorders--Text Revision* at 34 (*DSM-IV-TR* ), 34 (4th ed.2000).

(Tr. 170).

The same month, James Tripp, Ed.D. completed a Psychiatric Review Technique, finding that Plaintiff experienced the affective disorder of depression (Tr. 173, 176). Based on Plaintiff's treating and consultive records, Tripp found that Plaintiff experienced mild restrictions of activities of daily living and maintaining social functioning as well as moderate difficulties in maintaining concentration, persistence, or pace (Tr. 183). A Mental Residual Functional Capacity Assessment completed on the same day indicates that Plaintiff experienced a moderately limited ability to carry out detailed instruction, but was otherwise not significantly limited (Tr. 187-188). Tripp, noting that Plaintiff managed to function independently on a daily basis, concluded that he retained the ability to perform "simple, sustained, unskilled work" (Tr. 189).

### iii. Material Submitted to the Appeals Council

In January, 2001, Michael F. Abramsky, Ph.D. conducted a psychological evaluation of Plaintiff, finding that he experienced "slow thinking, concentration problems, but most of all a mood of dejection and overall pessimism" (Tr. 201). Abramsky opined that Plaintiff's sleep problems and social withdrawal were the result of his occupational frustrations, concluding that Plaintiff experienced a constant low level of depression (dysthymia) (Tr. 204, 206, 208).

### D. Vocational Expert Testimony

VE Don Harrison, Ph.D., classified Plaintiff's former work as an operations airport manager as skilled (SVP level 8) at the light exertional level (Tr. 235).

**E.  Medical Expert Testimony**

Dr. Mary Jo Voelpel testified that a medical etiology had not been established for Plaintiff's headaches, indicating that his treaters found that they were "anxiety related" rather than attributable to a physical ailment (Tr. 236).  Voelpel concluded that Plaintiff had not exhibited "any physical dysfunction in terms of inability to ambulate . . . move[,] or lift" (Tr. 236).  In response to questioning by Plaintiff's attorney, Dr. Voelpel acknowledged that the headaches, although stress induced, could nonetheless create severe symptomatology (Tr. 236).

Michael Finn, Ph.D reviewed Plaintiff's psychological therapy report by Dr. Feldstein, characterizing the assessment as a mental status examination (Tr. 238).  Drawing conclusions from Dr. Feldstein's reports, he found that Plaintiff experienced anxiety and depression affecting his activities of daily living ("ADL") and social skills (Tr. 239).  Finn stated that Dr. Feldstein's report did not recommend activity restrictions, noting that another psychiatrist, Dr. Qadir found that Plaintiff's functioning impairment was non-severe (Tr. 239, 240-241).  He noted further that Dr. Qadir found Plaintiff's psychomotor activity normal along with average self-esteem and a well organized thought process (Tr. 241).  Finn added that Dr. Qadir had assigned Plaintiff a GAF of 50 as a result of "psychosocial stressors" (Tr. 242).

Finn deemed Drs. Feldstein and Qadir's reports "very inconsistent," noting that Feldstein, in contrast to Qadir, found Plaintiff disabled from all gainful employment (Tr. 243).  He noted that the State Agency psychologist found that Plaintiff could perform

"simple, sustained, unskilled work," but would encounter significant problems with more complex mental processes consistent with his past work[2] (Tr. 245). In spite of inconsistencies between Feldstein and Qadir's opinions, he observed that both doctors found a major depressive disorder with a guarded prognosis (Tr. 246). Finn further noted that both Feldstein and Qadir found the absence of marked limitations (Tr. 246).

### F.     The ALJ's Decision

Based on Plaintiff's August 16, 2002 application, ALJ Norris concluded that although Plaintiff was unable to perform his past relevant work as an airport operations manager, he was not disabled within the meaning of the Social Security Act (Tr. 23). Citing Plaintiff's medical records, the ALJ found that Plaintiff suffered from "reactional depression/anxiety" which interfered with his ability to perform "basic work activities of complexity and detail," (Tr. 19). The ALJ held that Plaintiff's impairments were considered severe based on the requirements of 20 C.F.R. § 404.1521, but found nonetheless that they did not meet or medically equal one of the impairments found in Part 404 Appendix 1 Subpart P, Regulations No. 4 (Tr. 19).

The ALJ found that Plaintiff retained the residual functional capacity (RFC) to perform "simple and repetitive unskilled work with no exertional limitations," adding that "[w]hile the claimant's mental impairment precludes complex detailed work, he clearly retains the ability to perform the basic mental abilities generally required by competitive,

---

[2]James Tripp, Ed.D. (Tr. 189).

remunerative, unskilled work" (Tr. 21).  He concluded that "despite any adversity that age, education, or skill level might impose, the entire occupational base of simple and repetitive unskilled work is available to the claimant" (Tr. 22).

The ALJ stated that Plaintiff's allegations of disability had been credited "to the extent that he is limited to simple and repetitive unskilled work.  His contention of impairment so severe that he is unable to perform any basic work activity is not reasonably supported by the record" (Tr. 23).   He supported his credibility finding by noting that Plaintiff's symptoms appeared "well before" he stopped working, noting further that Plaintiff actively participated in his discrimination lawsuit against his former employer   (Tr. 19-20). The ALJ disputed Plaintiff's alleged degree of social insolation, pointing out that since the onset of his illness, he had made overseas trips to attend to his ailing mother (Tr. 20).

### STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence.  42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir.  1985).  Substantial evidence is more than a scintilla but less that a preponderance.  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,*   800 F.2d 535, 545 (6th Cir.

1986)(en banc). In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## **FRAMEWORK FOR DISABILITY DETERMINATIONS**

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy. 20 C.F.R. §416.920(a). The Plaintiff has the burden of proof as steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## **ANALYSIS**

**A.  Listings 12.04(A) and 12.06**

Plaintiff argues first that the ALJ erroneously determined that he did not meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4. *Brief* at 26.  Plaintiff contends that his conditions of depression and anxiety mandated a disability finding at Step Three of the administrative analysis.  *Brief* at 26-29.[3]

Section 12.04 reads in pertinent part:

*Affective Disorders:* Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.
The required level of severity for these disorders is met when the requirements

---

[3]Plaintiff's fifth argument contends that Dr. Abramsky's report, presented for Appeals Council review subsequent to the administrative decision, contains new and material evidence, apparently acknowledging *Cotton v. Sullivan,* 2 F.3d 692, 696 (6th Cir. 1993) which states that a court may consider the additional evidence only for purposes of determining whether remand is appropriate under the sixth sentence of 42 U.S.C. §405(g).  *Plaintiff's Brief* at 36.  The *Cotton* court held that where the Appeals Council denies a claimant's a request for a review of his application based on new material, the district court cannot consider that new evidence in deciding whether to uphold, modify, or reverse the ALJ's decision." *Cotton* 2 F.3d at 695-96.

First, the later-submitted evidence is neither new nor material and should not form the basis of a sentence six remand.  Dr. Abramsky's January, 2001 which concludes that Plaintiff experienced depression and anxiety restates the findings of other treating and consultive sources.  Second, I note that Dr. Abramsky's conclusions were evidently prepared in anticipation of litigation against Plaintiff's former employer.  Accordingly, the 11-page report focuses mostly on establishing a causal connection between Plaintiff's job and his present mental problems.

Despite his recognition that the Court cannot consider Abramsky's report, Plaintiff inexplicably  cites his opinion frequently in his first three arguments.  The Court will discuss arguments A, B, and C omitting mention or consideration of Abramsky's findings.

>   in both A and B are satisfied.
>
>   A. Medically documented persistence, either continuous or intermittent, of one of the following:
>   1. Depressive syndrome characterized by at least four of the following:
>   a. Anhedonia or pervasive loss of interest in almost all activities; or
>   b. Appetite disturbance with change in weight or
>   c. Sleep disturbance; or
>   d. Psychomotor agitation or retardation; or
>   e. Decreased energy; or
>   f. Feelings of guilt or worthlessness; or
>   g. Difficulty concentrating or thinking; or
>   h. Thoughts of suicide; or
>   i. Hallucinations, delusions or paranoid thinking;
>
>   *And*
>
>   B. Resulting in at least two of the following:
>   1. Marked restriction of activities of daily living; or
>   2. Marked difficulties in maintaining social functioning; or
>   3. Deficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner (in work settings or elsewhere); or
>   4. Repeated episodes of deterioration or decompensation in work or work-like settings which cause the individual to withdraw from that situation or to experience exacerbation of signs and symptoms (which may include deterioration of adaptive behaviors).

Substantial evidence supports the ALJ's determination that Plaintiff's condition did not meet or equal a listing 12.04 at Step Three. Assuming for argument's sake that the great weight of evidence indicated that Plaintiff experienced an affective disorder under the "A" criteria listed above, such a finding must be accompanied by "B" criteria findings that included "marked" deficiencies in both activities of daily living and difficulties in maintaining social functioning; or, evidence of repeated episodes of decompensation in a work setting. The Court notes that in September, 2002 Dr. Feldman found that Plaintiff

"[c]ontinued to experience concentration, focus, and attention," stating again in a February, 2004 deposition that his patient "demonstrate[d] significant and marked impairments and difficulties in starting and completing tasks and maintaining efforts to get through the day and in pursuing interests and activities" (Tr. 120, 104). However, record evidence supports the ALJ's conclusion that Plaintiff experienced only mild "B" criteria limitations. Dr. Brazil found that Plaintiff's attention span was good, finding further that his short and long-term memory was intact (Tr. 156). Similarly, consultive physician Shelby-Lane reported that Plaintiff was "alert, awake and oriented to person, place and time" (Tr. 166). The Psychiatric Review Technique concluded that Plaintiff experienced only mild or moderate "B" criteria limitations (Tr. 187-188). Likewise, because a claimant must establish two *marked* "B" criteria limitations to establish a Step Three disability determination under Section 12.06 (anxiety) as well as under 12.04, Plaintiff's claim that he meets or medically equals the listings on the basis of this section fails.[4]

### B. Treating Physicians

Plaintiff argues further that the ALJ improperly discounted Dr. Feldstein's disability finding. *Brief* at 29. He contends that Dr. Finn's hearing testimony contained internal

---

[4] Under Section 12.06, Plaintiff can alternatively establish Step Three disability through a combination a "A" and "C" criteria. "C" criteria states that a claimant's condition must result in a "complete inability to function independently outside the area of one's home." 20 C.F.R., pt. 404, subpt. P, app. 1, § 12.06. However, substantial evidence supports a rejection of disability by means of the "C" criteria. As discussed by the ALJ, Plaintiff continued to shop regularly and traveled back and forth from Jerusalem to visit his ailing mother (Tr. 20).

-13-

inconsistencies and was accorded inordinate weight. *Id*. at 30. In addition, he maintains that although Finn characterized Dr. Qadir and Feldman's opinions as conflicting, in reality, the treating and consulting physicians' agreed in substantial part that Plaintiff experienced debilitating depression and anxiety. *Id.*

" In determining the question of substantiality of evidence, the reports of physicians who have treated a patient over a period of time . . . are given greater weight than . . . physicians employed and paid by the government . . ." *Allen v. Califano,* 613F.2d 139, 145 (6th Cir. 1980); 20 C.F.R. §404.1527(d) (evaluating evidence from treating sources). *See Jones v. Secretary of Health and Human Services*, 945 F.2d 1365, 1370 (footnote 7) (6th Cir. 1991) ("[I]t is well-settled in this circuit that treating physicians' opinions, based on objective evidence, should be accorded significant weight. If uncontradicted, the physicians' opinions are entitled to complete deference"). However, the deference accorded the treating physician is only appropriate when the examining physician's report is both "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." 20 C.F.R. § 404.1527(d)(2). In *Wilson v. Commissioner of Social Sec.* 378 F.3d 541, 544 (6th Cir. 2004) the court stated:

> "If the opinion of a treating source is not accorded controlling weight, an ALJ must apply certain factors--namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source--in determining what weight to give the opinion."

For the reasons discussed in Section A, substantial evidence supports the

-14-

ALJ's rejection of a portion of Dr. Feldstein's claims due to the fact that his findings are contradicted by other portions of the record.  Further, in and of itself, the ALJ's decision to weight Dr. Finn's opinion "above all others" does not constitute reversible error, even though his involvement with Plaintiff was limited to an analysis of his treating and consulting medical sources.  However, the Court notes that Finn's testimony contains the clearly erroneous conclusion that Drs. Feldstein and Qadir agreed that Plaintiff experienced "no marked limitations" (Tr. 246).  Contrary to Finn's statement, Dr. Feldstein noted in September, 2001 *and* February, 2004 that Plaintiff experienced marked limitations (Tr. 104, 122).  Finn goes on to misstate Feldstein's findings again: "It doesn't seem to be where there's offering any problems in terms of difficulties in being able to focus or concentrate or being able to complete activities" (Tr. 246).  However, in direct opposition to this statement is Feldstein's finding that Plaintiff experienced "*marked impairment of capacity to maintain concentration, focus, and attention*" (emphasis added) (Tr. 122).

If the ALJ had accorded less than controlling weight to Finn's opinion, the use of the erroneous testimony to support his disability finding might not present grounds for remand.  However, the ALJ's own statement that "Dr. Finn's expert opinion is weighted above all others.  It is consistent with the substantial evidence of record and is the most reasonable"indicates that Finn's defective testimony factored greatly into his findings and thus taints his ultimate conclusion that Plaintiff was not disabled (*see*

Section C, *infra*) (Tr. 21). The ALJ's determination founders on its acknowledged reliance on Finn's testimony and should be remanded on this basis.

### C. Step Five Determination

Plaintiff argues that at Step Five of his analysis, the ALJ erroneously relied on the Appendix 2 Medical-VocationalRules rather than vocational expert testimony to deny him benefits. *Brief* at 35. He submits that because the ALJ acknowledged that he experienced non-exertional limitations, he was required to elicit the VE's testimony. *Id.* at 35-36.

At Step Five of the administrative analysis, the burden of proof shifts to the Commissioner to establish that the claimant retains the residual functional capacity to perform specific jobs existing in the national economy. *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984). "In many cases, the Commissioner may carry this burden by applying the medical-vocational grid at 20 C.F.R. Pt. 404, Subpt. P, App. 2, which directs a conclusion of 'disabled' or 'not disabled' based on the claimant's age and education and on whether the claimant has transferable work skills." *Wilson, supra,* 378 F.3d at 548 (6th Cir. 2004). While "in the case of a non-exertional impairment, the grids may be used to direct a conclusion if the claimant's non-exertional impairments do not significantly reduce the underlying job base . . . the ALJ must back such a finding of negligible effect with the evidence to substantiate it." *Lopez v. Barnhart* 78 Fed.Appx. 675, 679, 2003 WL

22351956, *4 (10th Cir. 2003)(internal citations omitted). Pursuant to 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 200.00(e) and SSR 85-15, if a nonexertional limitation substantially limits a claimant's ability to perform other work, reliance on the grids is improper. "[W]here a nonexertional limitation might substantially reduce a range of work an individual can perform, the use of the grids would be inappropriate and the ALJ must consult a vocational expert." *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001); *see also Wilson, supra*, at 548.

The ALJ stated that Plaintiff "clearly retains the ability to perform the basic mental abilities generally required by competitive, renumerative, unskilled work," including "responding appropriately to supervision, co-workers and usual work situations" and thus justifies his use of the grids on the finding that Plaintiff experiences only minimal limitations as a result of depression (Tr. 21). However, the ALJ's finding that Plaintiff experienced only insignificant deficiencies as a result of depression is flawed for two reasons.

First, although the ALJ deemed Plaintiff's non-exertional limitations insubstantial to the extent that he did not consult the VE, this conclusion stands at odds with his Step Two finding that Plaintiff experienced both severe depression and anxiety.[5] If at that step of his analysis the ALJ had found the absence of any non-

---

[5]Of course, a VE was present at the administrative hearing. However, his testimony was limited to a brief discussion of Plaintiff's past relevant work (Tr. 235). The ALJ did not pose a hypothetical question or ask for a jobs finding.

exertional limitations (conditions that would impact Plaintiff's residual capacities) he would have properly found Plaintiff not disabled at Step Two. Further, the ALJ again acknowledged more than minimal non-exertional limitations in his ultimate RFC which states that Plaintiff was limited to "only simple and repetitive unskilled work with no exertional limitations," admitting that Plaintiff's "mental impairment precludes complex detailed work" (Tr. 21).

Second, as discussed in Section B., the ALJ's finding of minimal impairments and the ultimate non-disability finding is premised on his reliance on Dr. Finn's erroneous conclusion that neither Qadir nor Feldman found that Plaintiff experienced marked impairments or other concentrational deficiencies. Of course, as discussed above, that error, in and of itself, justifies a remand. The fact that Dr. Finn's misstatements also served as a basis for the finding that Plaintiff was not disabled under the grids further illustrates the need for a remand. This is not *de novo* review, and it is not for this Court to presume how the ALJ would have ruled with the benefit of accurate testimony.

However, the errors in the administrative decision, while critical, do not suggest that Plaintiff is automatically entitled to benefits. Thus, I find that pursuant to *Faucher v. Secretary of Health and Human Services*, 17 F.3d 171, 176 (6th Cir. 1994), this case should be remanded for further proceedings consistent with this Report and Recommendation.

## CONCLUSION

For the reasons stated above, I recommend that Defendant's Motion for Summary Judgment be DENIED, and that Plaintiff's Motion for Summary Judgment be GRANTED, remanding this case for further fact-finding.

Any objections to this Report and Recommendation must be filed within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

        s/R. Steven Whalen
        R. STEVEN WHALEN
        UNITED STATES MAGISTRATE JUDGE

Dated: October 16, 2006

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served on the attorneys and/or parties of record by electronic means or U.S. Mail on October 16, 2006.

        s/Susan Jefferson
        Case Manager